**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) DOCKET NO. 5:21-cr-00238-M-1 |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| MARIA ROSARIO | ) |
| SANTILLAN-RODRIGUEZ, | ) |
|  | ) |
| Defendant. | ) |

**TRANSCRIPT OF DETENTION HEARING**
**BEFORE MAGISTRATE JUDGE BRIAN S. MEYERS**
**FRIDAY, JULY 23, 2021; 11:34 AM**
**RALEIGH, NORTH CAROLINA**

**FOR THE PLAINTIFF:**
United States Attorney's Office
By: Brandon Boykin, AUSA
150 Fayetteville Street
Suite 2100
Raleigh, NC 27601

**FOR THE DEFENDANT:**
Guirguis Law, PA
By: Nardine M. Guirguis, Esq.
434 Fayetteville Street
Suite 2140
Raleigh, NC 27601

**ALSO PRESENT:**
Arianna Aguilar, Interpreter

Audio Operator: CLERK'S OFFICE PERSONNEL

eScribers, LLC
7227 N. 16th Street
Suite 207
Phoenix, AZ 85020
973-406-2250
www.escribers.net
Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(973) 406-2250 | operations@escribers.net | www.escribers.net

                              I N D E X

|                          |        |       |          |         | VOIR |
| WITNESSES:               | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
| For the Plaintiff:       |        |       |          |         |      |
| Matthew Manning          | 6      | 26    | 42       | 50      |      |
|                          |        |       |          |         |      |
| For the Defendant:       |        |       |          |         |      |
| Betuel                   | 54     | 61    |          |         |      |
| Santillan-Rodriguez      |        |       |          |         |      |


| EXHIBITS | DESCRIPTION                  | ID. | EVID. |
| For the Plaintiff:                              |
| P-1 | Mexican birth certificate       |     | 12    |
| P-2 | Mexican passport                |     | 12    |
| P-3 | California birth certificate    |     | 12    |


| CLOSING ARGUMENTS:   | PAGE |
| For the Plaintiff    | 71   |
| For the Defendant    | 77   |


| RULINGS:                                      | PAGE | LINE |
| Government's motion for detention granted     | 84   | 13   |

(973) 406-2250 | operations@escribers.net | www.escribers.net

P R O C E E D I N G S

THE COURT:  Are counsel ready to proceed?

MS. GUIRGUIS:  Yes, Your Honor.  But I would like to be briefly heard in one second.

THE COURT:  Certainly, and you may have a moment.

MS. GUIRGUIS:  Thank you, Your Honor.

THE COURT:  Ready to proceed?

MS. GUIRGUIS:  Yes.  Yes, Your Honor.

THE COURT:  I'm getting ready to call the case.

We're here in the case of the United States vs. Santillan-Rodriguez, case number 5:21-cr-238.

Ms. Santillan-Rodriguez, we are here today to hold a detention hearing in order to determine whether you are released from custody pending trial on the charges that the Government's brought against you.

Before we proceed with the hearing, I will hear from you, Ms. Guirguis.

MS. GUIRGUIS:  Thank you, Your Honor.  Before we proceed with the hearing, I would just like to make sure to place on the record that it is the defense's position that this does not qualify as an (indiscernible) case.  I understand that the government is moving, and has moved, for detention.  However, I want to preserve the record and identify that, obviously, it's not a 3142(f)(1), so we can kind of gloss right through that.  I think, if anything, the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Government may potentially indicate that it's an (f)(2). However, by statute, that would require a serious risk of flight or a serious risk that the defendant will obstruct justice or threaten witnesses. There is simply no evidence to that effect. As a matter of fact, there's quite the opposite.

She has a disabled son that requires constant medical care at UNC. She is now the only guardian that could potentially be allowed to bring him to these appointments and obtain his medications.

So I would submit to the Court, respectfully so, that this is not -- this doesn't even qualify for a detention hearing. And I want to make sure to place that on the record, and we're certainly still prepared to move forward.

THE COURT: Very well. Thank you, Ms. Guirguis.

With that being raised, I do want to -- I do want to hear from the government before we proceed with the detention hearing on the motion itself with regarding to 3142(f)(2), the basis for the government's motion.

MR. BOYKIN: One moment, Your Honor.

Your Honor, the basis for this motion is -- I will just go ahead and let the Court know that Ms. Rodriguez -- Santillan-Rodriguez is one of three members of this family to be prosecuted for various immigration crimes. Her husband has also been charged, as well as her son.

Your Honor, I believe that (f)(2) does actually apply

because, as you'll learn through credible evidence, she has assumed a different alias that's different from her actual name, she's provided a false birth date, she's been aware of these things.

So the risks of nonappearance, Your Honor, or the risk of flight is that she can simply not avail herself to the Court through assuming different aliases or continuing to engage in the different types of fraud that we expect that Your Honor will hear about throughout this hearing. And she can simply just disappear from the radar in plain sight, because I think some of the evidence you will hear is about the living arrangements and how this family is very large and how there have been, through use of her documents and use of other documents, various family members have been able to commit various different types of crimes using false information.

So I think the risk is not necessarily that she will flee the country, but the risk is that she can, basically, disappear in plain sight and not avail herself to the Court the way she has basically disappeared and become a different person over the years in this country. So that will be the basis of the government's motion.

THE COURT: Thank you, Mr. Boykin. Is there anything further to present, rather than the motion itself?

MR. BOYKIN: Not from the motion itself, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Based upon the proffer of the government with regard to the motion for detention itself, as to whether a detention hearing is warranted, I do find that -- based upon the government's proffer that the defendant does present a -- this is a case in which it involves a serious risk that Ms. Santillan-Rodriguez would flee, as noted by the government. Not necessarily -- not flight from the country, but flight from prosecution. Therefore, we will proceed.

And I certainly have noted your argument for the record, Ms. Guirguis.

We will proceed with the detention hearing based upon that finding and the government's motion under 3142(f)(2)(A), a case that involves a serious risk that a person will flee.

I will hear the Government on any evidence that you wish to present with regard to the motion.

MR. BOYKIN: Your Honor, the Government will call Agent Manning to the stand.

PLAINTIFF'S WITNESS, MATTHEW MANNING, SWORN

THE CLERK: And could you state your name for the record, please?

THE WITNESS: Yes, my name is Matthew Manning.

MR. BOYKIN: May I proceed, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MR. BOYKIN:

(973) 406-2250 | operations@escribers.net | www.escribers.net

Q.   Good morning, Agent Manning.  How are you employed?

A.   I work for the U. S. Department of State's Diplomatic Security Service as a special agent.

Q.   Okay.  And what are some of your duties and responsibilities for them?

A.   We investigate violations of passport and visa fraud.

Q.   Okay.  And are you the case agent in this case for the defendant, Maria del (ph.) Rosario Santillan-Rodriguez?

A.   Yes, I am.

Q.   Okay.  And she's charged with a number of different violations.  I guess it will be -- probably would be best to take them one by one.  Can you tell us about a review of her passport application?

A.   Yes.  So in April of 2019, Ms. Santillan submitted a DS-11, which is a passport application, in Wendover, North Carolina.  As proof of her identity, she provided North Carolina driver's license, and as proof of citizenship, she provided a California birth certificate.  Ultimately, this application was flagged and additional information was requested of Ms. Santillan.  So a supplemental packet was delivered to her with questions from the State Department.  Her -- her responses were not sufficient to substantiate any claims and was forwarded on to the fraud department within the State Department.  (Indiscernible) checks were then conducted based on the information she did provide, and the consulate,

excuse me, in Guadalajara, Mexico, was asked to do a records check for her information.

Q. All right, let me stop you there and let's back up a little bit.

A. Of course.

Q. You said that she provided some information. Can you tell the Court what type of information she provided to the government to try and verify her identity?

A. Yes. That was a North Carolina driver's license --

Q. Um-hum.

A. -- and a birth certificate from California.

Q. Okay. So then you said that you requested some additional information?

A. Correct.

Q. And what did she provide in terms of that request?

A. It's basically additional information on family members, passport experience, places of residence, et cetera.

Q. And you said that that information was determined to be insufficient?

A. Yes, to substantiate it. There were gaps in the time lines and no real way of contacting any of the individuals and no records were found --

Q. Okay.

A. -- of these -- of some of these individuals.

Q. Okay. So how did the government know to reach out to

(973) 406-2250 | operations@escribers.net | www.escribers.net

Guadalajara?

A.    So there was a -- a presumption that -- that Ms. Santillan was not born in the United States, was -- was born in Mexico.  And so it's routine for the State Department to reach out to our embassies and consulates overseas to verify the veracity of -- of documents, birth -- birth certificates, et cetera.  So a request was sent to Guadalajara, and with the bio data provided by Ms. Santillan in her -- her application and her supplemental.  Due to the relationship that the consulate has with local officials, Jalisco State Civil Registry was -- was asked if they could run that information. They provided a record back to the fraud prevention manager.

Q.    Okay.  And when you say bio data, what kind of information is that?

A.    Sure.  That would be the name, the date of birth, and the parents' information, parents' names, date of births for them.

Q.    And are you aware of the date of birth that the defendant initially provided?

A.    Yes, she initially provided birthdate of April 15, 1970.

Q.    And based on your investigation, did you find a different birthdate for this defendant?

A.    Yes.  Based on the response from the Jalisco Civil Registry, they provided a birth certificate for a Maria del (ph.) Rosario Santillan-Rodriguez matching the same parent's names, but a birthdate of April 17, 1962.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Direct

MR. BOYKIN: Okay. Your Honor, may I approach?

THE COURT: You may.

BY MR. BOYKIN:

Q. Agent, I'm going to hand you what's been pre-marked as Government's Exhibit Number 1, Government's Exhibit 2, and Government's Exhibit 3. Taking them one at a time, what does Government Exhibit Number 1 appear to be?

A. Exhibit Number 1 is a Jalisco State Mexican birth certificate for Ms. Santillan.

Q. Okay. And does that fairly and accurately -- is that the birth certificate that you got from your contacts at the embassy?

A. Yes, so it's ultimately a copy of a birth certificate. This would possibly be the one you would seize during your search warrant.

Q. Okay. And does that fairly and accurately depict the birth certificate as you remember it?

A. Yes.

Q. Does it appear to have been altered in any way?

A. No.

Q. All right. And what is Government's Exhibit Number 2 appear to be?

A. Number 2 is a Mexican passport in the name of Maria del Rosario Santillan-Rodriguez with a birthdate of 15 April 1962.

Q. Okay. And does it also contain a picture?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Direct

A.    It does.

Q.    And does that picture appear to be the defendant that's sitting here?

A.    Yes, it does.

Q.    Okay.  And do you how that document was obtained?

A.    Yes, this passport was obtained during a search warrant of the -- Ms. Santillan's residence.

Q.    Okay.  And does that fairly and accurately depict the passport that was seized?

A.    Yes, it does.

Q.    Does it appear to have been altered in any way?

A.    No.

Q.    And what is Government's Exhibit Number 3?

A.    Number 3 is a California birth certificate that was submitted by Ms. Santillan during her passport application.

Q.    Okay.  And was that also seized?

A.    Yes, multiple copies were seized.

Q.    Okay.  And does that fairly and accurately depict the California birth certificate that was seized?

A.    Yes, it does.

Q.    Does it appear to have been altered in any way?

A.    No.

MR. BOYKIN:  Your Honor, at this time I would move to admit Government's Exhibits 1, 2, and 3.

MS. GUIRGUIS:  Your Honor, can I --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Direct

THE COURT: Ms. Guirguis, have you --

MS. GUIRGUIS: -- I take a look at one of them?

THE COURT: Have you had a chance to look at these?

MS. GUIRGUIS: Yes, I will say that the Government has provided that to me. But I wanted to take a look at it before submission, if that would be appropriate?

THE COURT: You may.

MS. GUIRGUIS: All right. May I approach, Your Honor?

THE COURT: Yes, you may.

(Pause)

MS. GUIRGUIS: Your Honor, may I reapproach?

THE COURT: You may.

MS. GUIRGUIS: Thank you.

(Pause)

THE COURT: Any objection, Ms. Guirguis?

MS. GUIRGUIS: No, Your Honor.

THE COURT: All right. I will put Government's Exhibits 1, 2, and 3 in the record of this detention hearing.

MR. BOYKIN: Thank you, Your Honor.

BY MR. BOYKIN:

Q. Now, Agent Manning, you mentioned that those documents were obtained during a seizure. Tell us about what lead to that seizure?

A. Yes. Well, based on this information that we'd

(973) 406-2250 | operations@escribers.net | www.escribers.net

collected, you know -- initially, based on initial record checks, I also conducted an interview of Ms. Santillan and her daughter Vanessa Cruz (ph.) at -- at the residence.

Q. Okay. And you say this was done at the residence?

A. Yes, there's two residences right next to each other.

Q. Okay. And tell us about what, if any, type of information you learned during that interview?

A. Yes. So I had asked Ms. Santillan, through her daughter for translation purposes, to tell me the story of, you know, why -- of, you know, her application, you know, her life history, where she was born, et cetera. She provided me with a story that she was born in California and quickly returned to Jalisco, Mexico, where she stayed until approximately 1996 where she then smuggled herself into the U.S.

Q. Now, when you say the term "smuggled", is that a direct quote?

A. Direct quote?

Q. From the defendant, that she smuggled herself back in?

A. No. She -- she basically alluded to coming over surreptitiously across the border.

Q. Okay. And did you find that statement to be unusual?

A. Yes, it was.

Q. Why?

A. Because she's applying for a U.S. passport, so why would she need just, you know, to come across the border, you know,

(973) 406-2250 | operations@escribers.net | www.escribers.net

surreptitiously?

THE COURT: Sir, before you move forward, I just want to make sure I understand correctly.

THE WITNESS: Please.

THE COURT: You said, I just missed this, the defendant said she was born where?

THE WITNESS: In California.

THE COURT: In California, okay. And then went to Mexico?

THE WITNESS: And then moved, yeah, to Jalisco for approximately twenty-five years.

THE COURT: Okay.

THE WITNESS: And then came back into the U.S.

A. So I asked her, I was, like, why would you come across the border in this fashion if you're a U.S. citizen? And the story she said, was that she was unaware of her birth in the United States and her U.S. citizenship until her mother, as she lay dying, provided her with a social security card with her name on it. I asked her, that seems kind of odd, why would, you know, your mother, you know, allow you to, you know, cross the border, you know, to evade law enforcement if you're -- if you're a lawful U.S. citizen. She said that her mother told her that the reason she didn't tell her she was a U.S. citizen is because she didn't want her brothers and sisters to be jealous of her.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Direct

BY MR. BOYKIN:

Q. Okay. And did you confront her with that Mexican birth certificate that you have?

A. Yes. So I asked Ms. Santillan, if she had returned to Mexico at any point?

She initially said, she had never gone to Mexico since coming to the U.S. in 1996. She then relented and said, she did go back to Mexico because her mother was -- was ill and she wanted to see her.

I asked her, how she returned?

And she said she flew.

I said you should -- you would have to have a passport to fly back into Mexico, do you have a Mexican passport?

And she said she did. At one point, she had applied for a passport in Raleigh and received it and flew to Mexico.

I asked her how she got back into the U.S. again.

And she said that she came across the border again, once again, evading -- evading police.

I asked her if she was in possession of the passport.

She said that she only applied for one passport and that was to go on that trip, and then she left all of her documents in Mexico, and has never applied for a U.S. passport again.

Additionally, during our checks we found a record of a visa application for Ms. Santillan in Guadalajara. I asked her if she had ever been to the consulate in Guadalajara?

She said she had never been there

I asked her if she'd ever applied for a visa.

She said she'd never applied for a visa.

I then presented the visa record and she then said, yes, I did apply for a visa. And she was denied in 1999 for a visa to the U.S. as an (indiscernible).

Additionally, I then provided her with a copy of the birth certificate that we -- we had a record of. I showed it to her, I said, is this your birth certificate, you know, is this your information?

She confirmed that the parent's names on the birth certificate were hers, and when it came to the name, her daughter said, no, this isn't my mom, this says Maria Santillan-Rodriguez. At which point, Ms. Santillan turned to her daughter and said, no, that's my real name.

Q. Okay. So basically, in essence, the defendant confirmed that that was her actual Mexican birth certificate?

A. Yes.

Q. Okay. And she was actually born in 1962 and not 1970 as she claimed?

A. Correct.

Q. And is it fair to say, that over the course of this interview, her story changed a couple of times?

A. Correct.

Q. Okay. Now, you mention her applying for a visa. Would a

(973) 406-2250 | operations@escribers.net | www.escribers.net

United States citizen have to apply for a visa for entry into this country?

A.   No.

Q.   Okay.  And you said that Visa was denied back in 1999?

A.   Correct.

Q.   Okay.  Do you have any record of her again applying for a visa?

A.   No.  During the interview, she said she'd applied twice, but we could only find a record of one application.

Q.   Okay.  And also she mentioned that she had flew back to Mexico because her mother was ill, but she did not fly back?

A.   Correct.

Q.   Okay.  Said she actually --

A.   Came across the border in the same fashion.

Q.   Okay.  And what did that indicate to you based on your training and experience?

A.   That she is not a U.S. citizen, she is a citizen of Mexico.

Q.   Okay.  And do you know if the defendant is married?

A.   I do.

Q.   Okay.  And can you tell the Court about her marriage?

A.   Yes, she's married to Alfredo Cardenas (ph.).

Q.   Um-hum.

A.   They have been married for a number of years and have multiple children together.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Q.   Um-hum.

A.   They applied for a marriage certificate, though, in twenty -- I believe it was 2019, in the state of North Carolina, though they had been married previously in Mexico.

Q.   Okay.  And did you have opportunity to do some investigation into the husband, Alfredo (ph.)?

A.   Yes.

MS. GUIRGUIS:  Objection, Your Honor.  Relevance.  We're here for Maria Rosario Santillan-Rodriguez, we're not here in regards to the husband.

THE COURT:  Mr. Boykin, if you can proffer the relevance of the question, you may proceed.  If not --

MR. BOYKIN:  Your Honor, the relevance is that the husband is determined to be an illegal alien.  He's also being prosecuted in this case.

One of the charges here is marriage fraud.  And I believe that this agent has knowledge and can connect the relevance as to her attempting to possibly make him a United States citizen through illegal means.

THE COURT:  Well, based upon the government's proffer, I do believe that question is relevant with regard to -- as stated.

MR. BOYKIN:  Thank you, Your Honor.

BY MR. BOYKIN:

Q.   So I'll re-ask the question.  Did you have opportunity to

investigate Alfredo?

A.    Yes.

Q.    And what, if anything, did your investigation conclude?

A.    That he, too, did not have lawful presence within the United States and he was working using a false social security number.

Q.    Okay.  And why is that significant to this defendant?

A.    Because family members of hers were attempting to gain derivative status citizenship, due to her (indiscernible) or, you know, proving her being a U.S. citizen.

Q.    Okay.  And you said so they were using her status to attempt to, I guess, enhance themselves?

A.    To validate their presence.

Q.    Okay.  So along those lines, did you find another family member that had used this defendant's information to try and validate their citizenship?

A.    Yes, Freddy Cruz (ph.).

Q.    And who is Freddy Cruz?

A.    Freddy Cruz is the son of Ms. Santillan and a Salvador Cruz (ph.), by prior marriage.

Q.    Okay.  And are you familiar with, I guess is it the --

A.    N-600?

Q.    -- the N-600?

A.    Yes.

Q.    Can you tell the Court what that is?

(973) 406-2250 | operations@escribers.net | www.escribers.net

A. So Mr. Cruz had been deported and arrested on a couple different occasions. He was in removal proceedings again and then he filed an N-600 for an adjustment of status saying he actually was a U.S. citizen and cannot be deported because of derivative status because of his mother.

Q. Okay. And based on all the information that you've had throughout your investigation; is that correct?

A. Is -- sorry, is what correct?

Q. Can he be a derivative status because of his mother?

A. Yes, he can.

Q. He can?

A. Yes, if he's --

Q. Well, let me ask a better question.

MR. BOYKIN: Strike that.

Q. If his mother's here illegally, can he claim status based on her?

A. No, he cannot.

Q. Okay. And was he arrested for this, actually?

A. Correct.

Q. Okay. Are you aware of incidents where this defendant has tried to vote?

A. Yes.

Q. Okay. How many incidents are you aware of?

A. It's multiple incidents, but I -- I'm not sure of the exact number. I know that she did vote in the most recent

presidential election, November 3rd, 2020.

Q.   All right.  And are you aware how she went about being able to vote or how she tried -- how she --

A.   How did she register?

Q.   Yes.

A.   That, I'm not entirely sure if it's during the application for a driver's license, if it's a motor/voter --

Q.   Um-hum.

A.   -- application, but you could have multiple applications to -- to register to vote.

Q.   And on these applications, is there a section that declares under penalty of perjury, that asks whether or not you're a United States citizen?

A.   Yes.

Q.   And to your knowledge, what was the defendant's answers?

A.   She said she was a U.S. citizen.

Q.   Okay.  And you said there are multiple instances where she --

A.   Voted.

Q.   -- where she voted?  Okay.  Now, going back to this search warrant, did that take place in March of this year?

A.   Correct.

Q.   And you mentioned that you found a number of documents, can you tell us what all was found to your knowledge?

A.   Yes.  During the search warrant, multiple identity

(973) 406-2250 | operations@escribers.net | www.escribers.net

documents for Ms. Santillan and other family members were -- were located. Of those, was a Mexican passport that Ms. Santillan denied being in possession of when I initially interviewed her. And additionally, birth certificates for the majority of her children, ones from Mexico and also from the United States, where she had listed her place of birth on both the Mexican and the U.S. birth certificates for her children as being born in Mexico and being born in 1962.

Q. Okay. Now just to clear that up, you said there were birth certificates for Mexico and the United States?

A. Correct.

Q. Are we talking about for this defendant or for the defendant and her children?

A. For the defendant, I found birth certificates for her.

Q. Um-hum.

A. And I also found birth certificates for her children.

Q. Okay.

A. Some of her children were born in Mexico and some of her children were born in North Carolina.

Q. Okay. And the birthdate for this defendant -- well, the birth certificate for this defendant, as we've already talked about, shows she was born in 1962?

A. That's correct.

Q. Now, was that also reflected on the Mexican passport that you found?

A.    That's correct.

Q.    And you stated that initially she denied having a Mexican passport?

A.    Yeah, she denied having it, saying it was no longer in her possession.

Q.    Um-hum.

A.    Because I asked, when she said she'd flown to Mexico because her mother was ill in '99, around then --

Q.    Um-hum.

A.    -- I asked her for a copy or her passport.  She said, she did not have one, that she left all those documents in Mexico.

Q.    Okay.  And to be clear, when did you first ask her about this passport?

A.    This was in October of 199 -- or excuse me, 2019.

Q.    Okay.  And then when you conducted a search warrant in 2021, you found that Mexican passport?

A.    Correct.

Q.    Okay.  Did you also find any registration cards?

A.    Yes, sir.  Which type?

Q.    During the search, you said you got a passport, a birth certificate; did you find registration and social security cards as well?

A.    Yes.

Q.    And what, if any, significance did those have?

A.    A number of those documents they were social security

(973) 406-2250 | operations@escribers.net | www.escribers.net

cards, and basic green cards, immigration cards.

Q. Um-hum.

A. But they were fraudulent as verified.

Q. And when you say they're fraudulent, what do you mean by that?

A. It was the information of the defendant's husband Mr. Cruz, with a fictitious social security number. Also, work authorization permits for some of her other children that had no legal status, they were fraudulent, fraudulent cards.

Q. Okay, so basically -- well, tell, you tell us, what is the significance of having fraudulent social security cards?

A. It is used to -- to gain employment, but it is only needed if you're not a U.S. citizen.

MR. BOYKIN: Okay, thank you.

THE COURT: Were there, before you move from that topic, were there fraudulent cards in the defendant's name also?

THE WITNESS: There were not.

THE COURT: They're not. Okay.

THE WITNESS: It was just in the family members.

THE COURT: All right, you may proceed.

MR. BOYKIN: Thank you, Your Honor.

BY MR. BOYKIN:

Q. Now, you mentioned the son who filed the N-600, Mr. Cruz, did you have occasion to speak with him about his mother's

(973) 406-2250 | operations@escribers.net | www.escribers.net

citizenship?

A.    I did not.

Q.    Okay.  Were you aware of an interview that he gave about his mother's citizenship?

A.    No, I was not privy to that.  I was a Homeland Security --

Q.    Okay.

A.    -- Investigations.

Q.    So to your knowledge, does the defendant have different aliases?

A.    Yes.

Q.    Okay.  Approximately, how many, if you know?

A.    Well, variations of the name, but in the United States it is Rosario Santillan.  And her Mexican birth certificate and her passport and her visa application all say Maria del Rosario Santillan-Rodriguez.

Q.    Okay.  And why is that significant, if it is?

A.    Well, it's a truncation of her name, but she's using it on all her official documents.  Her full Mexican birth name is not listed on her U.S. documentation.

Q.    Okay.  And is it possible that these different variations of the name could actually be considered different people in a computer system?

A.    Yes, absolutely it could.

Q.    Do you know what name she voted under?

(973) 406-2250 | operations@escribers.net | www.escribers.net

A.    I believe it was Rosario Santillan.

MR. BOYKIN:  One moment, Your Honor.

Thank you, agent.

Those are my questions, Your Honor.

THE COURT:  Cross-examination?

MS. GUIRGUIS:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MS. GUIRGUIS:

Q.    Agent, I'm sorry, what was your -- I kept on thinking Emilio Estevez --

A.    Yeah.

Q.    -- and you're not Emilio Estevez.

A.    It's Manning.

Q.    What is your name?

A.    Manning.

Q.    Manning, okay.  Agent Manning, I have a few questions for you.  You indicated that you spoke with my client Ms. Santillan a couple of -- a few times it seems like; is that correct?

A.    It was one, yeah, officially.

Q.    One officially?

A.    Yeah, in 2019 is where I sat down for my initial interview with her and her daughter Vanessa.

Q.    Okay, let's start there.  So in 2019, I believe you said October of 2019; is that correct?

(973) 406-2250 | operations@escribers.net | www.escribers.net

A.   Correct.

Q.   All right.  Where was that interview?

A.   It was at 80 Thomerson, which is in Louisburg.  It's a house that Ms. Santillan listed as her residence on her application, passport application, but it was not the residence of her daughter and a couple other family members.  She had since moved to 120 Thomerson Lane.

Q.   But she was there and you interviewed her, correct?

A.   Yes.

Q.   Okay.  And you also spoke of a search warrant, correct?

A.   Correct.

Q.   What date was that?

A.   That was in March of 2021.

Q.   And what location was that at?

A.   That was at 120 Thomerson and 80 Thomerson.

Q.   Both locations?

A.   Both, simultaneous.

Q.   And was she present at that point as well?

A.   She was.

Q.   And when was she arrested?

A.   She was arrested last month in June.

Q.   In June --

A.   Yes.

Q.   -- of this year?

A.   Yes, this year.  Correct.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Q.   And where was she arrested at?

A.   At 120 Thomerson Lane.

Q.   And I'm not sure if you remember, but I figured I would ask you.  Each time that you went to Thomerson Lane, was her disabled son, who I point to the record is on the first row here, was he there?

A.   Yes, he was.  He was always at 120 Thomerson.

Q.   And he was there both times that you were, or actually, three times that you were there?

A.   Not the initial time because I was at 80 Thomerson.

Q.   80, that's right, you were at 80.

A.   But I'd gone a separate time and spoken to her husband and --

Q.   Oh, when was that time?

A.   That was approximately in December of 2019.

Q.   Yeah.  So in December of 2019, you visited that location again or another time?

A.   Yeah, 120 Thomerson, correct.

Q.   Yeah.

A.   Her son was there every time.

Q.   So he was always there at 120 Thomerson Lane?

A.   Correct.

Q.   How many times did you either go to, just so that way we know, 80 Thomerson Lane?  Once, is that correct?

A.   I've gone there twice.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Q. Twice, okay. And how many times did you go to 120 Thomerson lane?

A. I guess, three times.

Q. Three times. And was this in the span of 2019 to 2021?

A. That's correct.

Q. And every single time was Ms. Santillan there?

A. Not every time. So there were other instances, but I went more for surveillance, trying to see which cars were there --

Q. Okay.

A. -- and so on. But as far as announcing my presence and having something scheduled, that was --

Q. She was always there?

A. Yes.

Q. The surveillance, how many times were you surveilling the property?

A. I -- maybe six, seven times.

Q. And --

A. I'm not sure of the exact number.

Q. Okay. During those six or seven times, did you see Ms. Rosario, I mean, Ms. Santillan -- I want to go by the first name -- Ms. Santillan?

A. Yes. During surveillance, I only saw her one time when she was going --

Q. Outside?

(973) 406-2250 | operations@escribers.net | www.escribers.net

A.    Yes, outside the house at 120.  But other times, no, it was just vehicles out front and nobody in the front yard.

Q.    Okay, that makes sense.  And in regards to 80 Thomerson Lane and 120 Thomerson Lane, are they next to each other?

A.    They're -- yeah, very close by.  I think there's a couple of houses between them.

Q.    Okay.  Now, let's move forward from there.  It was my understanding that you work for the State Department; is that correct?

A.    That's correct.

Q.    All right.  And as an officer at the State Department, are you familiar with different countries' laws?

A.    Yeah, well, I mean, you know, there's different laws --

Q.    Just a familiarity.  Are you also familiar with record-keeping of other countries?

A.    Yes.

Q.    Okay.  Is the record-keeping, let's say, of Mexico the same as the record-keeping of the United States?

A.    Well, I don't have firsthand knowledge of that.  But, no, I think probably the standards are different in different countries.

Q.    And would it be fair to say -- and have you solely worked in North Carolina or have you worked at any border states?

A.    No, no border states.

Q.    No border states.  Are you familiar with different issues

(973) 406-2250 | operations@escribers.net | www.escribers.net

that arise from border states when individuals are born in the United States but families are living across the border?  And that's not an uncommon thing in those border states; is that correct?

A.   No, I would think so.

Q.   Okay.  And would it be fair to say that every single time you went over to Thomerson Lane, when you had the opportunity to speak with Ms. Santillan, she was politely cooperative?

A.   Yes, I mean, she -- yes, she was cooperative.  But I had to basically tease out information from her which she would initially deny and then admit to it later during the --

Q.   Well, do you speak Spanish?

A.   I speak some, yes.

Q.   Oh, so you are able to fluently engage in a discussion?

A.   No, so we have a translator during the interview.

Q.   But you have used the daughter, correct?

A.   Yes, she was the -- no.  Sorry.  It was myself and another State Department agent, and a Louisburg sheriff who was fluent in Spanish, was -- was present.  She was the one that did the translations, but also the daughter Vanessa was there, as well.

Q.   And her daughter Vanessa actually did the translations because the other translator was not very good; is that right?

A.   I cannot speak to that.

Q.   Well, at some point, her daughter Vanessa actually did

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Cross

the translations, correct?

A.   That I don't recall.  I know it was --

Q.   Did you not indicate that on direct examination that her daughter Vanessa did translations for you during the interview?

A.   Yeah, no, I guess she did in some, but --

Q.   Okay.  Now, you indicated that when Ms. Santillan filed to obtain her passport that there were gaps in the time line.  What do you mean by that, gaps in the time line?  What time line?

A.   Oh, I -- I'd have to refer to that.  It's up on the questionnaire, it's multiple pages and I'd have to look at it.  Can I do that or?

        MS. GUIRGUIS:  Yes, if I may also have an opportunity to look at what he's looking at, that will be fine.

        THE COURT:  (Indiscernible).

        THE WITNESS:  Yeah, please.

        MS. GUIRGUIS:  May I approach, Your Honor.

        THE COURT:  Yes.

    (Pause)

        THE WITNESS:  This is basically the form.  It's a supplemental questionnaire and it's --

        MS. GUIRGUIS:  Why don't you say it loud enough so that way the Judge can hear?

        THE WITNESS:  Oh, sorry.  I apologize.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Cross

THE COURT: (Indiscernible).

A.   This is a form -- this is a supplement of a questionnaire that the State Department will send when they would like additional information from -- from someone when they are applying for a passport.  It basically asks for multiple sections, your name, date of birth, Social Security number, place of birth, and then asks for all family relationships you have, parents, siblings, your spouse, employment section, where you've worked in the past, schools that you had attended, any residence you have lived at.

Q.   I don't see any gaps, are there any gaps here?

A.   So, yes.  So from here she only has her residences from 1996, it does say the five most recent.

Q.   Yeah, so that's the five most recent.

A.   Yeah, so --

Q.   So then where are the gaps?

A.   So the determination is made by the fraud department and state -- U.S. State Department.  They're the ones that submit this.  This is basically consular services issue.  They're the ones that review these things.  And then based on their findings, it was then forwarded to a field office for additional questions.  So their determination of this document was this, plus her previous passport application, was insufficient to substantiate and so it would be further --

Q.   But why?  You indicated on direct examination it was due

(973) 406-2250 | operations@escribers.net | www.escribers.net

to time gaps.  I don't see any time gaps.

A.    So, I don't know, specifically -- I don't know, I guess, there's employment gaps.  I'm trying to figure out --

Q.    Where are the employment gaps?  Where are the employment gaps?

A.    Well, she has a single employment.

Q.    And that's because she has a disabled son.

THE COURT:  Now let's --

MR. BOYKIN:  Objection.

THE WITNESS:  Yeah.

MR. BOYKIN:  Your Honor, can we get back to --

THE COURT:  Let's return to counsel today.  Well, this is -- the purpose of reviewing this, and let me make sure this is clear for the record, the agent is testifying from documents in the case file.  There has been an opportunity for the defense counsel and the government to both review and look at the pages from which he is testifying.

Sir, if there are additional pages that you're going to be using as it would be the basis for your testimony, if you will pause so that both counsel can review that as you move forward.  But --

BY MS. GUIRGUIS:

Q.    Are there any additional documents that you need to review so that way we know, or can move on if not?

A.    No, we can move on.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Q.   Okay, thank you.  So you actually could not point to any time gaps.  You also indicated that there was a fraud department review; are you familiar with the fraud department review or are you only familiar with the ultimate results that they indicated?

A.   Yes.  So we are basically an investigatory arm of the State Department.  So Consular Affairs is the ones that issues the associated passports.  They have their own mechanism for investigations and queries.  So for instance, the birth certificate that was requested from -- or excuse me, document search that was requested from the consulate in Guadalajara, that was done by Consular Affairs and the fraud prevention managers there.  So her application was in April, they did those checks around --

Q.   April of what year?

A.   Oh, sorry, of 2019 is when she applied.

Q.   So April of 2019 she applied for a passport?

A.   Yes.  And then her passport's received -- or as the application's received, it's reviewed.  There --

Q.   Do you know -- yeah, and you indicated that it was flagged, do you know why it was flagged?

A.   Yes.  So there are a number of fraud indicators at the State Department.  There's this --

Q.   What were they?

A.   So one is a -- the birth certificate, her California

(973) 406-2250 | operations@escribers.net | www.escribers.net

birth certificate, was a delayed registration birth certificate. So --

Q. But one can get a delayed registration --

MR. BOYKIN: Objection, Your Honor.

THE COURT: Ma'am, if you ask the question, let the witness answer first before asking another one.

A. So once again, there's a number of fraud indicators they look at. Having a delayed birth certificate is one. Having a non-institutional birth certificate, meaning she was born -- she stated on her birth certificate -- there was a -- it was basically an affiant birth certificate, where she states she was born inside an apartment building due to, like, quick onset labor. And the two affiants, or two individuals, that are family members that attested, you know, in 2019 that they were present during the birth.

Additionally, her social security card was recently issued. Because of her age, applying for a passport that late in life is one. One of these by themselves is an -- an indicator of fraud, but there are a number of things that the State Department looks at. In an aggregate they could make, not a determination, but a determination that more stuff needs to be looked at.

THE COURT: And for sake of clarity, what you just listed as far as the delayed birth certificate and the attestations, was that a part of -- that was information

(973) 406-2250 | operations@escribers.net | www.escribers.net

included in the application for the --

THE WITNESS: Yes. So she -- when she -- when you apply for a passport, you have to have two forms of identification, and she provided a North Carolina state driver's license and, as proof of citizenship, she provided a California birth certificate.

THE COURT: Okay. Well, thank you.

BY MS. GUIRGUIS:

Q. You can get a delayed birth certificate; is that correct?

A. Absolutely.

Q. Okay. And you can be born inside of an apartment, correct?

A. Yes. Yes, you can.

Q. And you can also get a social security card more recently than not?

A. Yes.

Q. Okay. And so these indicators are indicators for further review, not necessarily indicators of fraud?

A. Oh, no, absolutely not.

Q. And all the information that was, in essence, indicated, she freely gave, correct? In other words, she freely gave the delayed birth certificate, she freely gave the details regarding the being born inside --

A. She wasn't asked for it. That's just part of her passport application.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Cross

Q.   So she gave that information, there wasn't any --

A.   You have to -- you have to provide a birth certificate and another form of identification --

Q.   I understand.

A.   -- at the time of application, yeah.

Q.   But the information that is being used was being used by way of her giving it, correct?

A.   Yes, but like I asked her for her -- her Mexican passport and she said she didn't have one.  But then during a search, we --

Q.   Okay.

A.   -- found one.

Q.   Well, let's talk about that real quick.  The Mexican passport, it was a discussion that you had with her October of 2019, correct?

A.   Yes.

Q.   And it wasn't until March of 2021 that you located the Mexican passport?

A.   That's correct.

Q.   So she may not have had it then in October of 2019?

A.   No, she specifically said to me, that she has not applied for another passport after the one that she used to fly to Mexico.  She said she applied for one passport that she used to fly to Mexico.  And she then said she had left that passport, came across the border again, and has never been

(973) 406-2250 | operations@escribers.net | www.escribers.net

back to the Mexican consulate in Raleigh, never applied for another Mexican passport.

Q.   Okay.  What passport did you find in the search in March of 2021?

A.   It was a Mexican passport.

Q.   Okay.

A.   But what --

Q.   I suppose what I'm trying to determine is, she didn't have it -- it's possible she didn't have it in 2019, but then she has it in 2021?

A.   No.  So the passport was valid from 2008 until 2011.

Q.   I'm not talking about the validity of the passport, I'm talking about the actual passport.

A.   She said she had never been back and never applied for a Mexican passport after 1999.  This is a passport that was applied for and valid after that date from 2008 through 2011.

Q.   Okay.

        THE COURT:  And is this Government Exhibit 2?

        THE WITNESS:  That's correct.

BY MS. GUIRGUIS:

Q.   Now, in regards to the applications that were submitted, the applications that you stated that were submitted were for family.  Did you look at the alien registration files for those respective family members?

A.   No, that was Homeland Security Investigations

(973) 406-2250 | operations@escribers.net | www.escribers.net

(indiscernible).

Q. So you don't know what was in those applications or anything to that effect?

A. No. No, yeah.

Q. Do you know or did you obtain information regarding the fact that she actually utilized an attorney, and family members utilized and went to an attorney to seek assistance regarding this unique issue?

A. No, I would assume so, but not specifically.

MS. GUIRGUIS: Okay. May I have a moment, Your Honor?

THE COURT: You may.

BY MS. GUIRGUIS:

Q. I think it's actually important to indicate about the N-600. The N-600, is when you have a direct family member, or actually it's a parent, and in essence, that parent is a U.S. citizen, you can file as that child, minor or otherwise, an N-600, correct?

A. Yes.

Q. Okay. That's different from an N-400, which is naturalization?

A. I'm not fully familiar with all the immigration forms. That's more of a Homeland Security Investigations questions.

Q. Now, none of the forms that were submitted themselves -- none of those forms were actually fraudulent, correct?

A.   I don't believe so, but I'm not sure exactly which forms you're referring too.  And once again, those forms are submitted to USCIS.

Q.   No, I'm not talking about that, I'm sorry.  I'm talking about with respect to Ms. Santillan, none of the forms that she submitted for the past work, they weren't fraudulent, correct?

THE COURT:  Ms. Guirguis, I'm going to ask you to rephrase that.

MS. GUIRGUIS:  Okay.

THE COURT:  Are you referring to the form itself was fraudulent --

MS. GUIRGUIS:  No.

THE COURT:  -- or the information?  Because the information appears to be the -- I mean, it is appears to be the basis of Count I.

MS. GUIRGUIS:  Yes, so the -- I mean, so what I'm talking about -- and I apologize, Your Honor, I'm talking about, like, the birth certificate.  That was actually issued properly.

BY MS. GUIRGUIS:

Q.   It wasn't a fraudulent birth certificate, correct?

A.   No.  So the document is issued by California, but we believe that it was applied for using fraudulent information.

Q.   So that belief, what is it based on?

(973) 406-2250 | operations@escribers.net | www.escribers.net

A.    Based on my investigation and the interviews with the subject.

Q.    Okay.  So but it's not based on actual documents that you can attest to their authenticity?

A.    Yeah, that Mexican passport --

Q.    Yeah, can you attest --

A.    -- from the State of Jalisco --

Q.    -- to that authenticity?

A.    No, but the State of Mexico, their civil registry, can.

Q.    The Mexican passport, real quick, one can actually have dual citizenship --

A.    Yes.

Q.    -- and have two passports?

A.    Absolutely.

        MS. GUIRGUIS:  May I have one more moment, Your Honor?

        THE COURT:  You may.

        MS. GUIRGUIS:  Nothing further, Your Honor.

        THE COURT:  Redirect?

        MR. BOYKIN:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. BOYKIN:

Q.    Now, Agent Manning, you mentioned that you found the defendant at 120 Thomerson Lane?

A.    Correct.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Q.   Is that address listed on any of her official documents, to your knowledge?

A.   Sorry, I don't recall right now if it's on her driver's license or --

Q.   Okay.

A.   -- or what the current one is.

Q.   Okay.  But you mentioned 80 Thomerson Lane was a listed address, where was that listed at?

A.   That was on her passport application and also on, excuse me, I believe, the supplemental, as well.

Q.   Okay.  And Ms. Guirguis asked you if the defendant was present every time you came to talk to her, and I think you mentioned that these were scheduled visits?

A.   Well, yes.  And so the interview we had --

Q.   Um-hum.

A.   -- and then as far as schedule, I mean, during the search warrant, the arrest warrants, she was present at 120.  It was only during the interview where she was at 80 Thomerson.  But during surveillance, I saw her reporting at 120 Thomerson.

Q.   Okay.  But the times where you announced your presence, she knew you were coming, with the exception of the search warrant?

A.   Correct.

Q.   Okay.  And she asked you about her disabled son being there, are there anyone -- is there anyone else that lives at

(973) 406-2250 | operations@escribers.net | www.escribers.net

these addresses?

A.   Yes, multiple.

Q.   Multiple people?

A.   Yes.

Q.   Do you know who these people are?

A.   Yes.  At the 120 Thomerson, she has a son, Bryan Cardenas (ph.) --

Q.   Um-hum.

A.   -- who lives there with his children.

Q.   Okay.  Does he have a spouse?

A.   Yes, he does.

Q.   Okay.  So there is another family that lives there, as well?

A.   Um-hum.

Q.   And is that the same for the 80 Thomerson address as well?

A.   Yes.  At 80 Thomerson, is predominantly her daughter, Vanessa Cruz, and her children.  Freddy Cruz is also residing there, as well.  I'm unsure of exactly who else.

Q.   Okay.  And Vanessa Cruz, does she also have a spouse, to your knowledge?

A.   No, I'm not sure.

Q.   Okay.  But there is Vanessa and her children, and Freddy was living there, as well?

A.   Yes.

Matthew Manning - Redirect

Q.   Okay.  And she asked you -- Ms. Guirguis asked you about Mexican record-keeping and you said it's maybe a little bit different from the United States.  But it's true, is it not, that Mexico has a record of this defendant?

A.   Yes, they were able to search their records and pull the forty-five-year-old birth certificate.

Q.   Okay.  And the date of birth on that Mexican birth certificate, is different than the date of birth on the California birth certificate, correct?

A.   Correct.  The Mexican one says 1962, her California one says 1970.

Q.   And not only does the Mexican birth certificate say 1962, what is the birthdate for the Mexican passport?

A.   It is 1962.

Q.   Okay.  Now, are you familiar with the process of getting a birth certificate in California?

A.   Yes.

Q.   And can you tell the Court, is it -- well, first, before you tell the Court, is it a simple process?

A.   Yes, yes.

Q.   All right.  And can you explain that to the Court, please?

A.   Yes.  So there were a number of questions that we had about how this application was approved and what someone needs to prove that they're born in California.  We ended up

(973) 406-2250 | operations@escribers.net | www.escribers.net

speaking with the Office of Legal Counsel in California and had a conference call with the attorney, Mr. Diaz, and myself, one of the contractors. But the attorney's office, and about six or seven other people from the Office of Legal Services from California, what they basically said is that it is an online process. You can send -- send -- or send, excuse me, send documentation in and I -- we subpoenaed, ultimately, California and -- for any -- any documentation that Ms. Santillan had provided to California during her application.

On -- specifically, on Exhibit 3, it states that under facts of birth and documentation, it says Social Security number, Social Security Administration (indiscernible). That was the only thing that was provided to them. So Ms. Santillan has a social security card that was issued, you know, in her name and she provided them with that card.

And then, additionally, on the delayed registration birth certificate, there's a line for two affiants to sign, basically attesting that they were -- that their relationship to the person that was born, and their knowledge of the birth. So for both people it says, they were a cousin and a sister, and they were both present at birth.

We asked the Office of Legal Counsel for California, do you verify any of the information on this?

And they said no.

I said, did you run the Social Security number, do you

(973) 406-2250 | operations@escribers.net | www.escribers.net

know there was a valid Social Security number?

They said no.

I said, do you verify any information from the affiants?

And they said no. The only information provided for the affiants is their age, no birthdates, and a name and a signature.

THE COURT: Was the Social Security number on there, indeed, valid?

THE WITNESS: Yes, it was. It was, but this was more of a question for California --

THE COURT: Sure.

THE WITNESS: -- do you validate any of the information and they basically said no.

THE COURT: They do not.

THE WITNESS: And that they were barred from verifying any of the information, and that it would take an act of California, of Congress, to modify the laws for them to actually verify any of the information provided.

So hypothetically we said, not to be ridiculous, but could I write Mickey Mouse and Donald Duck as the affiants, you know, and provide a Social Security card?

And the answer was, yes, you could get a delayed registration birth certificate. So there was no record of birth whatsoever for Ms. Santillan, other than providing a Social Security card and two names.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Matthew Manning - Redirect

THE COURT: And for the record, while you were -- when you were pointing to a form, that was Government Exhibit 3; is that correct?

THE WITNESS: Yes, that's Government Exhibit 3. Correct.

THE COURT: Okay. You may proceed.

MR. BOYKIN: Thank you.

BY MR. BOYKIN:

Q. And when going through -- I guess, we were talking about, Ms. Guirguis was asking you about determinations about the gaps in the history?

A. Um-hum.

Q. You didn't actually make that determination, right?

A. No, that's not by me. That's the Consular Affairs who do their investigation, and the case -- once again, the application was in April of 2019, the birth certificate was returned from Guadalajara in August of 2019, and then I received the case shortly thereafter, and in October, I interviewed her.

Q. But the people that make that determination, they don't deem it fraud on one particular factor, they do a -- I guess, a totality of factors; is that fair to say?

A. Correct, they use the fraud indicators, their investigation, and then they give it to the law enforcement or the State Department to do in-person interviews and criminal

(973) 406-2250 | operations@escribers.net | www.escribers.net

database tracks, things that they wouldn't have access too.

Q. So fair to say, for it to be marked or, I guess, flagged as potential fraud, it would have to meet a number of criteria?

A. Yes, correct.

Q. Okay. And this N-600 that Mr. Cruz used, you said it's based -- I guess, the basis of citizenship is that one of your parents is a citizen. And are you aware of who Mr. Cruz's parents are, his biological parents?

A. Yes, it's Ms. Santillan and Salvador Cruz.

Q. And Salvador Cruz has been determined to be an illegal alien, correct?

A. No, Salvador Cruz has -- has never been, as far as I know, to the U.S. Apparently, he passed away.

Q. Okay. But fair to say, he's not a United States citizen?

A. No, he's not.

Q. And based on your investigation, you do not believe that this defendant is a United States citizen, either?

A. Yes. No, she's not.

Q. So that would be the basis of the fraud on Mr. Cruz's N-600?

A. Yes, that's correct.

MR. BOYKIN: Okay. Your Honor, those are my questions.

Thank you, agent.

(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Any different questions, Ms. Guirguis?

MS. GUIRGUIS: Yes, briefly.

RECROSS-EXAMINATION

BY MS. GUIRGUIS:

Q. It was Mr. Cruz, not Ms. Santillan, that fills out the N-600, correct?

A. I'm not sure.

Q. Who fills out an application that, in essence, is warranted for the beneficiary; isn't it the beneficiary?

A. So I don't want to speak to that. I -- I don't -- don't really deal with those.

Q. Do you have the application with you?

A. No, I do not, Homeland Security does.

Q. So if I were to tell you that it is actually Mr. Cruz who fills out the N-600, you would have no reason not to believe me, correct?

A. I -- I'm not sure exactly how -- how the form is filled out.

MS. GUIRGUIS: Your Honor, the Court can take judicial notice very easily that the N-600 is filled out by the applicant himself.

THE COURT: And with regard to that, I'll consider the testimony of the agent, and that is that he does not have knowledge of how it was filled out. It's just the purpose of the form, the Court is clear on what the purpose is,

(973) 406-2250 | operations@escribers.net | www.escribers.net

regardless of who filled it out.

MR. BOYKIN: Thank you.

MS. GUIRGUIS: And I just want to clarify, Your Honor, the reason why I'm asking that is because I don't want that to be improperly imputed on my client.

THE COURT: I understand.

Any further questions, Ms. Guirguis?

MS. GUIRGUIS: Just one more.

BY MS. GUIRGUIS:

Q. Who did you speak to at the California -- in California? Who specifically did you speak to?

A. It was the Office of Legal Counsel.

Q. And do you recall who it was that you spoke to in the Office of Legal Counsel?

A. I will have to get that name, I don't recall.

Q. And the Office of Legal Counsel, where is that located?

A. In California.

Q. Yes, well, where? Do you know where in California?

A. Oh, I believe, it was L -- L.A. County.

Q. Is it a federal or state agency?

A. State.

MS. GUIRGUIS: No further questions, Your Honor.

THE COURT: If you can give me just a moment here, I may have a few follow up questions.

(Pause)

(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Sir, if you know, just before -- I want to clear on the indictment, the different counts. There are several counts involving registration to vote --

THE WITNESS: Yes.

THE COURT: -- and there is a count alleging that the defendant registered to vote on February 14th of 2020 and then on September 22nd of 2020. Is there anything -- do you have any knowledge of what those -- why the two separate registrations or attempts to register? I do see there is a count, Count XIII, is the -- alleges that she did indeed vote --

THE WITNESS: Uh-huh.

THE COURT: -- in the last election.

THE WITNESS: I'm sorry, which count was that where you were referring to election?

THE COURT: Counts IX and XI. Counts X and XII appear to be companion charges to that, they're the same offense conduct.

THE WITNESS: Yeah, so one's probably -- Count XI is probably her application. I'm unfamiliar with North Carolina registration, if they take you off the rolls every couple of years.

THE COURT: Okay.

THE WITNESS: But looks like she had applied again at a, in September, in preparation, I assume, for the

(973) 406-2250 | operations@escribers.net | www.escribers.net

presidential.

THE COURT: In any event, these are two -- I mean, clearly, in the indictment --

THE WITNESS: Yeah.

THE COURT: -- that the grand jury returned, there is this separate charge of making a false statement in order to register to vote in February and September, separately. You don't have any of the underlying facts for that, do you?

THE WITNESS: No, it's probably just based on a subpoena return from a North Carolina Board of Elections.

THE COURT: Okay.

THE WITNESS: (Indiscernible).

THE COURT: Any additional questions from counsel in light of mine?

Ms. Guirguis?

MS. GUIRGUIS: No, Your Honor.

MR. BOYKIN: No, Your Honor.

THE COURT: Sir, you may step down. And before you do, if you can hand me the Government's Exhibits 1, 2, and 3, please? Thank you.

MR. BOYKIN: And Your Honor, there is no further evidence from the Government.

THE COURT: Very well.

Ms. Guirguis, do you have any evidence to present?

MS. GUIRGUIS: Yes, Your Honor. We would call Betuel

(973) 406-2250 | operations@escribers.net | www.escribers.net

Santillan-Rodriguez to the stand.

    DEFENDANT'S WITNESS, BETUEL SANTILLAN-RODRIGUEZ, SWORN

       THE CLERK:  Could you please state your name for the record, please?

       THE WITNESS:  Betuel Santillan-Rodriguez.

       THE CLERK:  Could you spell your first name, please?

       THE WITNESS:  B-E-T-U-E-L.

       THE COURT:  You may proceed.

       MS. GUIRGUIS:  Thank you, Your Honor.

                  DIRECT EXAMINATION

BY MS. GUIRGUIS:

Q.  I apologize, Betuel.  I think I mispronounced your first name, so I'm sorry.  And I'm going to go right ahead and refer to you as Mr. Santillan; is that okay?

A.  Sure.

Q.  Okay.  Mr. Santillan, do you know the young lady next to me on the left?

A.  Yes.

Q.  How do you know her?

A.  She's my maternal aunt.

Q.  She's your maternal aunt.  Would it be fair to say, that you've known her your entire life?

A.  Yes.

Q.  Okay.  And do you know long, roughly, she's then been --

oh, how old are you?

A.   Thirty.

Q.   Thirty, okay.  And are you a natural born citizen?

A.   I am not.

Q.   Okay.  Are you --

A.   I'm a naturalized citizen.

Q.   You're a naturalized citizen.  And when were you, if you know, because sometimes people are naturalized much younger; do you remember?

A.   Yeah, I think I was twenty-one, maybe.

Q.   And you are currently residing where?

A.   Currently, at my house.  It's 10241 NC Highway 58 in Castalia, North Carolina.

Q.   But has there been discussion regarding you moving, and have you moved some of your items elsewhere?

A.   So, yeah.  So pertaining to this situation, I am willing to, you know, move with my aunt in order to serve as a third-party custodian.

Q.   And so you're willing to, in essence, uproot your life and make sure you have focus on your aunt; is that correct?

A.   That is correct.

Q.   And how long have you lived in North Carolina, in the North Carolina area?

A.   Twenty-six years.

Q.   Okay.  And during that time, has my client, your aunt, also lived in the North Carolina area?

(973) 406-2250 | operations@escribers.net | www.escribers.net

A.    Yes.

Q.    Okay.  And let's talk about the residence that you're moving to; is that 120 Thomerson Lane?

A.    Correct.

Q.    Okay.  And have you had occasion recently to go over there?

A.    Yes, Wednesday to be exact.

Q.    Okay.  And what did you do when you went over there?

A.    So I went to, you know, kind of see where I would be while this continues or, you know, whatever the case may be.  I checked out the place.  Checked my room.  Moved some stuff in.  Made sure that there wasn't anything, you know, that shouldn't be there, and that the living situation is up to par for my aunt.

Q.    So you took the necessary preparations to ensure that it was a safe and compliant area, correct?

A.    Correct.

Q.    Okay.  And that was, in essence, making sure that there are no firearms and no alcohol and nothing that is illegal?

A.    Correct.

Q.    Okay.  And did you find anything there that was illegal?

A.    No.

Q.    Okay.  And do you know if that residence is being rented or owned?

A.    To my knowledge, it's owned.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Direct

Q.    And would you continue to ensure that that residence is in fact free of any firearms, alcohol, or drugs?

A.    That is correct.

Q.    And what would you make sure of with respect to Ms. Santillan in regards to residing there and staying there?

A.    Yeah, so, I mean, you know, I guess I would know what the guidelines are after today.

Q.    Um-hum.

A.    So whatever those guidelines are, I would make sure, you know, personally, that they are followed.  So if it's she's supposed to do something, that she does it.  If she's not supposed do something, that she doesn't do it.

Q.    And would you have an issue at all, if she wasn't supposed to do something, to immediately contact the United States Probation Office?

A.    No, not at all.

Q.    Now, you are currently employed, correct?

A.    I am.

Q.    Okay.  And where are you employed at?

A.    Coastal Federal Credit Union.

Q.    And what are your hours of employment?

A.    So branch hours are 8:30 to 5:30.  And usually, I arrive about fifteen minutes early and leave about fifteen minutes after closing.

Q.    Now, how would you ensure during the time period that you

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Direct

were at work, that she would be compliant?

A.   You know, physically, I wouldn't be in the home, but, I mean, I could definitely, for sure, call.  I know that, you know, her main priority is really her son.  So I don't foresee anything, you know, outside of the guidelines, really.  But I could call in, you know, during my breaks, during my lunch, FaceTime; you know, whatever the Court asks of me I'm willing to do.

Q.   You have no problem if the Court bestows upon you specifics to follow those specifics, do you?

A.   I do not have any problems.

Q.   Now, you referenced her son.  Are you familiar, and you may not be familiar with his diagnosis which is fine, but are you familiar with his ailments?

A.   Yeah.  So, you know, visually, as you can see, he's disabled; completely dependent on someone else.  I don't know his medical diagnosis, it's not something we really talk about. you know, but he's -- he's sick is basically what his mom said.

Q.   Does he require twenty-four-hour attention?

A.   Yeah.

Q.   And prior to Ms. Santillan's arrest, was it her that was giving him twenty-four-hour attention?

A.   Correct.

Q.   And was that pretty much her entire life?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Direct

A.    Yes.

Q.    So if she were to return to her home, Mr. -- and what's her son's name that's sitting in the first row here for the Court to identify?

A.    Jose (ph.).

Q.    Jose?

A.    Yeah.

Q.    And is it Santillan-Rodriguez?

A.    Cardenas.

Q.    Okay.  And Jose resides at 120?

A.    Correct.

Q.    And I think it was Thomerson Lane; is that correct?

A.    Thomerson Lane.

Q.    And do you know if Jose's on medication?

A.    Yes.

Q.    And he takes an array of medication that needs to be refilled regularly, correct?

A.    Correct.

Q.    And it would be his mom that would be refilling that medication?

A.    That is, to my knowledge, yes.

Q.    Now, if the home was outfitted for electronic house arrest, you would have absolutely no issue to ensure that you're working with the probation department to confirm that (indiscernible) is on electronic house arrest and it's

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Direct

compliant?

A.    Yes, I have no problem.

Q.    Now, one of the other things is that the Court may, in fact, place upon her a mandate to meet with the United States probation officers.  Would you ever have any issues regarding ensuring that she meets with her USPO?

A.    No issues.

Q.    Would you ever have any issue regarding ensuring she goes to court every time that it may be mandated upon her?

A.    No issues.

Q.    And would you ensure that she maintains contact with her United States probation officer?

A.    I would.

Q.    Would you also confirm and ensure on a regular basis, that she stayed within the control area that is bestowed upon her by the United States probation office and this honorable Court?

A.    Yes, ma'am.

Q.    Okay.  And if at any point in time, she were to do anything that would be even remotely violating any of the orders of the Court; what would you do?

A.    Based off the questions, I would call her probation officer, let him know (indiscernible).  You know, whatever my responsibilities is.

Q.    And you are actually pretty familiar with just making

sure you follow rules and regulations from your own personal employment; isn't that correct?

A. Correct, yes.

Q. Banking regulations are quite complex?

A. Exactly, yes.

Q. And you will ensure that, if at any point in time, you will contact the probation officer?

A. Yes.

MS. GUIRGUIS: No further questions at this time, Your Honor.

THE COURT: Cross-examination?

MR. BOYKIN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BOYKIN:

Q. Well, sir, is it okay if I call Mr. Santillan as well?

A. Um-hum.

Q. All right. Now, you mentioned that the defendant is your maternal aunt, meaning that's your mother's sister, correct?

A. That is correct.

Q. So did your mother and the defendant grow up together?

A. Yes.

Q. And where's your mother from?

A. Mexico.

Q. Okay. And they grew up together as children, correct?

A. Yes.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Cross

Q.   Okay.  And you said you became a naturalized citizen at twenty-one; is that correct?

A.   Yeah, I mean, around twenty-one, yes.

Q.   Okay.  So meaning you weren't born here, either; is that correct?

A.   That is correct.

Q.   Where were you born?

A.   I was born in Mexico.

Q.   Okay.  With your -- to your mother?

A.   Yes.

Q.   All right.  And so you've told this Court that you're willing to move to 120 Thomerson Lane; is that correct?

A.   Correct.

Q.   Who all lives at that address?

A.   Her disabled son and her other son, Bryan.

Q.   Okay.  Does Bryan have --

A.   (Indiscernible) his family.

Q.   And his family?

A.   Yes.

Q.   And how many people are in Bryan's family?

A.   It's his wife and his three sons.

Q.   Okay.  And does his wife work?

A.   I do not know.

Q.   Okay.  Do you know if Bryan works?

A.   Yes.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Cross

Q.   Okay.  All right.  And you said that the house is owned and not rented, do you know who owns the house?

A.   No.

Q.   Okay.  Now, would you be --

A.   I --

Q.   I'm sorry.

A.   I could assume that my aunt and her husband, but I don't know.

Q.   Okay.  And her husband, would that Fred (ph.) or Frederico (ph.)?

A.   No.

Q.   Who's her --

A.   His name is Alfredo.

Q.   Alfredo, I'm sorry.  Alfredo.  And Alfredo's currently in prison; is that correct?

A.   Correct.

Q.   Okay.  Now, would you be paying rent at this address?

A.   This has all, you know, kind of hit me at from out of nowhere, so that discussion has not taken place.

Q.   Okay.  So how long ago did the discussion happen for you to move to this address?

A.   Oh, when I was asked to be a third-party custodian about two-and-a-half to three weeks ago.

Q.   Okay.  So you were asked you said, two-and-a-half to three weeks ago to be a third-party custodian and you only

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Cross

went to go look at the home you said, this past Wednesday?

A.   Correct.

Q.   So you had never been over there before?

A.   Well, yeah, I mean, we're family.  So yes, I've been there before.

Q.   Okay.

A.   Throughout my (indiscernible), yeah.

Q.   But it is your testimony that no one has discussed whether or not you would pay rent or live there for free?

A.   Correct.  I mean, I can assume I wouldn't, if it's owned, then who would I pay -- you know, there's no point to pay rent to just anyone.

Q.   Well, you know, there's still bills, correct?  Property tax, light bills --

A.   I mean --

Q.   -- cable bills --

A.   I mean, yes.

Q.   And there's been no discussion of whether or not you would contribute to those bills, correct?

A.   Correct.

Q.   Okay.  Now, you say you mention that you work at Coastal Credit Union?

A.   Correct.

Q.   You get lunch breaks?

A.   I do.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Cross

Q. And you get regular breaks?

A. Correct.

Q. Are they at set times every day?

A. Not really. Not set, no.

Q. You said, not really; what do you mean?

A. Well, I choose when I take a break. My -- as I'm here today, my job is very flexible.

Q. Okay. And while you're being here today, you're not actually taking a break, you're actually off; is that correct?

A. Yes, I'm off.

Q. Okay.

A. But I will go to work after this is over.

Q. So typically, what time do you take your lunch breaks?

A. Anywhere between 11:30 to 1:30.

Q. Okay. And you've already stated that during that time, you get there typically fifteen minutes early, so about 8:15. So actually, your hours will be probably 8:15 to 5:45, correct?

A. Yeah.

Q. And during that time, the defendant would not be under your care, she would be with Bryan and his wife, correct?

A. And her disabled son.

Q. Okay. And yeah, speaking of the disabled son, are you aware that the defendant's been locked up since June?

A. Yeah.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Cross

Q. Okay. And who's been taking care of the son since then?

A. Her -- his siblings.

Q. His siblings. So it's been a joint effort?

A. Correct.

Q. So not just Bryan? How many siblings does he have, if you know?

A. Off the top of my head, six.

Q. Six?

A. Yeah.

Q. So that means you also have six cousins?

A. Correct.

Q. And it's your testimony that you would be able to report the mother if she committed any violations, and you would not be bothered by the fact that you would be held responsible by those six siblings?

A. No, I've never been in trouble with the law, you know, obviously. So I would not put my -- you know, myself in that predicament to be in trouble with the law. You know, obviously, if I haven't done it for myself, I wouldn't do it for someone else.

Q. Understood. Now, are you familiar -- are you aware that the defendant worked as a house cleaner, she cleans houses?

A. Yes.

Q. Okay. So you know that she works?

A. I don't know if -- like, I don't know, like, what her

(973) 406-2250 | operations@escribers.net | www.escribers.net

regular hours are, if she actually works. I know that she has done that as, like, a way to try to supplement some income, but that's not, to my knowledge, like, the full time thing now.

Q. Okay. So how often are you aware that she's worked?

A. I -- I'm not aware. I don't know her schedule.

Q. Okay. So you know that she has worked, you're just not aware --

A. Right.

Q. -- of when she has worked?

A. Correct.

Q. Do you know if she's worked any time in the past year?

A. I do not know.

Q. Okay. So how did you know she worked?

A. Well, I mean, you know I'm sure people talk about, you know, what you do, but you don't talk about how often you do it or, I mean, you know when it's, like, a side job like that. And I know that her main priority is her (indiscernible) and also has. But what are your hours that you work every day? That's not a discussion we've had.

Q. Okay. And let's be clear, you said people talk about it; who are these people that you're talking about?

A. When you get together as a family, I'm sure -- it's usually, you talk about what each other does.

MR. BOYKIN: Okay. So -- strike that, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Betuel Santillan-Rodriguez - Cross

Q.   So Ms. Guirguis also asked you about the son needing his medication refilled; is that correct?

A.   Correct.

Q.   Do you know how often that medication is refilled?

A.   I do not.

Q.   You don't know?

A.   No.

Q.   Okay.  But it's fair to say that his six siblings have been looking after him since both his father and mother are --

A.   I don't know.

Q.   -- in jail?

A.   I don't know all who.  I -- I'm going off of assumptions.  I currently don't live there.

Q.   Um-hum.

A.   So I don't care for him myself, so I can't really speak to who, but obviously someone is.  So my assumption is that his siblings have stepped up.

Q.   Okay.  Well, you testified on direct that the care of the son was primarily the mother's job, right?

A.   Yes.

Q.   But you're aware that other people also chip in and have been chipping in?

        THE COURT:  (Indiscernible).  He's answered that question.

        MS. GUIRGUIS:  Yes.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

MR. BOYKIN: Yes, Your Honor. Your Honor, those are my questions.

Thank you, sir.

THE COURT: Any further questions, Ms. Berk --

MS. GUIRGUIS: No, Your Honor.

THE COURT: Excuse me, Ms. Guirguis.

One question, sir. How close is your work to your aunt's house?

THE WITNESS: I'm in Cary, she's in Wilkesboro.

THE COURT: Okay.

THE WITNESS: So a thirty to forty-five minutes, depending on traffic.

THE COURT: Thank you, sir. You may step down.

Any further evidence to present?

MS. GUIRGUIS: Your Honor, just by way of proffer.

THE COURT: Certainly.

MS. GUIRGUIS: I can tell you that, based on our investigation, that although currently Jose, who I want to point out is in the front here, he actually has siblings that have, in fact, stepped up during the time that she has been incarcerated. But they haven't been able to take him to the doctor because she and her husband are the only ones that are listed as the legal guardians and can make legal decisions on his behalf. So that has actually prevented them from being able to take that next step. Now, of course, at this point,

(973) 406-2250 | operations@escribers.net | www.escribers.net

her husband, who's in custody and I can talk about that later, and so it's really going to be dependent upon her to be able to do that at this juncture.

Additionally, I want to point out to the Court that I did obtain the medical records. As I was thinking -- my intention was -- and I didn't obtain all of them, I just obtained what I could get my hands on. The unfortunate thing is I kept on thinking about HIPAA release forms and whether or not I can be able to publish these.

So I can proffer the fact that he is on an array of medication. I can certainly read them out to you, Your Honor.

THE COURT: Ms. Guirguis, you do not. I will certainly take note that he is disabled and there are medications that he is required to take as you have proffered.

MS. GUIRGUIS: And he's also been diagnosed with, unfortunately, an array of ailments, as well. I can certainly go over them or the Court can just make note of the fact that this requires twenty-four-hour care.

THE COURT: I do.

MS. GUIRGUIS: Okay. Now, in addition to that, Your Honor, I think it's actually important to note that one of the things that we learned, just while I was here in the courtroom, is that Jose has seizures when he is anxious. And he's anxious in areas that, in essence, he's not familiar with. And he had an episode as I walked in. And I can

(973) 406-2250 | operations@escribers.net | www.escribers.net

tell -- and I'm doing this only from my observation -- that he's calmed down a little bit since mom is in front of him.

And so just based on my observations during this short period of time, it is very clear that the anxiety in foreign or unknown places is very much a reflection upon him physically. And I will go right ahead and engage in further discussion regarding how that plays into my argument later.

That would be all the evidence at this point for the Defense, Your Honor.

THE COURT: Very well. I'll hear argument. We'll start with the government.

MR. BOYKIN: Your Honor, we would ask that you find detention as appropriate in this case. Your Honor, as always, the principle question is whether or not there is a combination or whether there's any factors or combinations of factors that would reasonably assure this defendant's appearance and that she's not a danger to the community.

And just right out the gate, Your Honor, I would just submit to you that we're not alleging that she's a danger to the community. So we will focus on the factor of whether or not there's any combination of conditions that would reasonably assure her appearance.

Now, Your Honor, Mr. Santillan that came up, I guess, the nephew of this defendant. Nice guy. Obviously, he's employed, but there's some things that he testified to that

(973) 406-2250 | operations@escribers.net | www.escribers.net

are important to point out.

Number one, Your Honor, he works approximately thirty minutes away from the home. So he testified that he typically gets there at least fifteen minutes early and leaves at least fifteen minutes later. Well, if you factor in the thirty minutes he needs to leave for traffic, we're actually looking at he's gone from that home from at least 7:45 in the morning until 6:15 in the evening.

And we heard testimony that there are other people that live at this residence. And although it's been discussed to him to come and live at this home and serve as a third-party custodian too, his testimony is that there's been no knowledge as to whether or not he would be contributing to the household. Your Honor, and I find that to be odd. I believe I would submit to the Court, it's a reasonable inference that part of his living there would be the fact that he would have to be the third-party custodian. And the fact that he would indeed try and keep her out of jail, and not actually report whether or not if she committed any violations.

Now, Ms. Guirguis has basically turned this hearing into an argument about her disabled son. And Your Honor, you've been here, he's been here the entire time, we've heard no outbursts from him. She's saying that he's calmed down since his mother has been here. Your Honor, he's been the same the entire time based on my observations, and I know the

Closing Arguments

Court has made observations, as well.

But Your Honor, they said that he requires twenty-four-hour attention and she's the person that's giving it to him. We know that she's been incarcerated since at least June, Your Honor, and we know that that attention has not stopped. That he has six other siblings that have and will -- have taken care of him.

And addition, Your Honor, how can she provide twenty-four-hour attention when she works. I believe, Mr. Santillan admits that she works. He doesn't know when she works, he wouldn't go that far, but he admitted that she works. So it's impossible for her to be this caregiver that they're trying to make her out to be when she -- there is times when she's away from the home. And he's already admitted that there is a very large amount of time where he cannot properly monitor her as her third-party custodian.

So Your Honor, also the very place that they're suggesting she go back to live, at this 120 Thomerson Lane, is the very place where a lot of the basis for this indictments have occurred. Your Honor, at this very residence we know that they found a Mexican birth certificate, that they found a Mexican passport, and they found a number of other illegal documentations, or as Agent Manning called, counterfeit cards, counterfeit Social Security cards, counterfeit registrations.

Your Honor, we know that based on the Mexican

passport and the Mexican birth certificate, that she was born in 1962. During the interview, there was some testimony as to whether or not who was translating, but one thing was very clear to the Government, when the daughter pointed out that the name says Maria del Rosario Santillan-Rodriguez, the mother said, that's my real name.

So she goes by a number of different aliases. She's known as Rosario Santillan, Rosario Rodriguez, Maria del Rosario Santillan-Rodriguez. Again, Your Honor, that presents a danger that she could hide in plain sight.

As far as the counts against her for the voter fraud, Your Honor, I would proffer to the Court that the basis for that is there's a very specific question when you register to vote. And it says that under penalty of perjury you attest that you are a United States citizen. And Your Honor, I would submit to you that this defendant is not a United States citizen.

As you heard Mr. Santillan testify, that his mother and the defendant grew up together, and he testified that he was even born in Mexico. He testified that his mother's born in Mexico. Your Honor, I would submit to you that it's a reasonable inference that this defendant was born in Mexico with mister -- the third-party custodian's mother, and they grew up in Mexico. I believe that that's confirmed when Agent Manning gives this testimony about the interview with the

(973) 406-2250 | operations@escribers.net | www.escribers.net

mother.

She gets a Mexican passport to fly and go see her ill mother. She flew home, however, she, as he said, smuggled herself back across the border. It simply does not make any sense, Your Honor. If you have valid registrations and valid IDs and valid passports, there's no need for you to then cross the border -- is because -- in an illegal fashion. You can simply come back if you're a United States citizen, but this defendant is not.

So again, the risk here, Your Honor, is that she will again disappear in plain sight because she has these different aliases. She has all these different passports and different types of documentation.

And it's important, Your Honor, her birth certificate is from California. And you heard that, not to be facetious, but the agent said that the two affiants you could put is Mickey Mouse and Donald Duck. As long as you have a valid Social Security number for them, that's not really checked. So suffice it to say, it's much easier to get a California birth certificate than it is a North Carolina birth certificate. And I believe, that's also very important because when that California birth certificate was applied for, based on the testimony that Ms. Guirguis got out of Mr. Santillan, the defendant's been in North Carolina since she's been here at least twenty-six years, I believe was the

(973) 406-2250 | operations@escribers.net | www.escribers.net

testimony. So for her to get a California birth certificate when she's been here in North Carolina, I believe that that just raises a lot of red flags.

So basically, the basis for her detention, Your Honor, is she's made false representation of the United States citizenship to conceal her illegal status. We've obtained evidence of her citizenship fraudulently to conceal her illegal status. She has demonstrated on numerous occasions the willingness to submit fraudulent applications, and she has the means, and she has traveled in the past to Mexico. She has the means to get out of the country.

So with the voter registration, and she actually voted in the 2020 presidential election. Again, Your Honor, not faulting her for wanting to participate in this democracy, but it's akin to possessing a firearm as a felon. In this country, we can have firearms, but you cannot if you're a felon. In this country, you have the right to vote, but you cannot if you're here illegally.

So this defendant is here illegally and she has shown on numerous occasions a willingness to perjure herself and claim false citizenship. And that is very dangerous, and for those reasons, I do not believe that there is a combination of conditions that will reasonably ensure her appearance. She has the ability to disappear here in North Carolina. She doesn't have to flee the country, but she can disappear simply

by obtaining another alias, putting in another false application, she can become a different person yet again.

She's not born in 1970, as she attests, she was born in 1962. Her name is not Rosario Rodriguez, it's Maria del Rosario. And I think the evidence against her is strong, Your Honor, and for those reasons she should be detained. Thank you.

THE COURT: Ms. Guirguis.

MS. GUIRGUIS: Yes. It's hard to contain myself, this is not a firearm by a felon case. I think it's very apparent that when you make that type of analogy, you've got to be very careful there because that has a firearms component to it, which clearly could make this case completely different.

THE COURT: Then Ms. Guirguis, before you continue, just so that both parties are clear, with regard to that, I recognize it for what it is, a comparison to the ability to vote based on some illegal status and not having anything assigned to a firearm to the defendant here. There is clearly nothing related to a firearm with this defendant.

And with regard to -- with regard to her son, as I said before, I have certainly made note that what the testimony was, that he is disabled and that he does require -- he does require twenty-four-hour care and that he does require medication. I don't feel that it's necessary to have any

(973) 406-2250 | operations@escribers.net | www.escribers.net

details related to that, because there has been, certainly, sufficient testimony about that.

MS. GUIRGUIS: I want to focus on the flight risk issue, since that seems to be what we are here for. Your Honor, you know, we kept on -- we kept on hearing this, you know, hiding in plain sight, hiding in plain sight. That's not the case here. It is very important to identify that this has been in investigation from 2019, at the very least, maybe even earlier, but the testimony would certainly state to at least from 2019.

And during that time period from 2019 to 2021, she could have, in fact, hid in plain sight, but she did not. And as we know, the best indicator of future conduct is usually past conduct, in the sense that she did not flee. We know of at least three instances where the officers went to that Thomerson Lane, 108 or 88 or -- those two areas, and she at no point in time attempted to flee nor did she flee.

If she were to, in fact, have in any way fled, then that would be an indication that she was a flight risk. But the fact that she didn't, and that type of time period is, in fact, a substantial time period, which is usually more than what I've seen in the past, there's no question that she's not a flight risk. That very piece of evidence negates the issue of flight risk. And I think that's actually probably one of the strongest pieces of evidence, along with the fact that her

son is disabled.

Now, in addition to that, Your Honor, as the Court is aware, we can also place electronic house arrest requirements upon her where she would only be able to leave that location for purposes associated with medical or, in fact, legal. It's not as if that's not an ability for the Court to proceed upon.

And certainly, if the Court is so inclined, we can also place a secondary, or a third-party custodian, in order to ensure that additional safeguard. But I would submit to the Court that that's not necessary.

And as the probation department actually did, they proceeded and reviewed upon everyone. It is our understanding, that anyone and everyone in that location is acceptable by probation; I do not have any indication otherwise. And I know that probation spoke to the residents at that location.

But I will tell you that, the family is willing to ensure that it's whoever the Court desires to reside there to reside there, just as long as Jose and Ms. Santillan are there.

Now, I also want to submit to the Court, because I think it's actually very important, is that when you do take a look at the factors here when it is discussed in each under 3142(g), when it is discussed the nature and circumstances of the offense, it's particularly referencing whether or not the

offense is violent or nonviolent in nature, or involves narcotics. That's where the focus is in the statute, and, in fact, none of those actually exist here.

Interestingly enough, when looking at the weight of the evidence, it doesn't matter what California does, that's on California. What matters is the fact that the documents here that were located, that are connected to my client, none of them are fraudulent. We can't say that they're fraudulent.

We also heard testimony that it's not unheard of for an individual to be born in the United States, but have family and reside elsewhere. These are the border states, this is just the possibilities of geography. I can tell you that based on my own immigration law experience, as an immigration attorney, that that is not uncommon.

Now I will submit to the Court, that we stand here right now and we indicate to this Honorable Court that we believe, she is a United States citizen and we are going to be fighting this matter. And so she has an interest to ensure that the information she did in fact provide the government is proved. And we have a lot of work in front of us because we're in essence proving a negative, but that's what we're going to do together.

When looking at the history and characteristics of the person, I will submit to the Court as well, that she worked a long time ago. There is no evidence that she's

working now. Ever since she knew that her focus has to be on Jose, she hasn't been working, and she's not intending on working. But the beautiful thing is that she has a family here in North Carolina that, obviously, is indicative of community and family support, which is a further known -- further factor that has to be taken into consideration under 3142.

She has no criminal history and she has long-standing in North Carolina. And I will say to Your Honor that there has been a recent Fourth Circuit case, I think it was United States (indiscernible), where the 4th Circuit specifically emphasized that Congress had a very clear intent that only a limited number of defendants should be subject to pre-trial detention.

And when taking a look at Salerno, which is a very pivotal United States Supreme Court case, it made it abundantly clear that the Bail Reform Act was carefully drafted to limit the circumstances under which detention may be sought to the most serious crimes.

This, Your Honor, is a presumption of release, not a presumption of detention. But it sets forth, pursuant to Congress's intent, that this should be presumption of release.

Your Honor, there is no question that this case requires pre-trial release, as even the United States Probation Office has recommended. Because that's what the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Bail Reform Act would require of us.

The ICE -- anything having to do with the questions of immigration, are themselves related to the offenses. I would submit to the Court, respectfully speaking, that to place too much emphasis on the charges themselves, would be inherently inappropriate because we wouldn't be in front of Your Honor if there weren't charges.

And the charges are, in fact, serious. There's no question about that. We believe that they are, in fact, warranting specific attention, and joint effort with our client, in order to make sure that we place in front of this Honorable Court a substantial defense. That, in and of itself, indicates that she's not a flight risk as well.

Now, very rarely do I have a case where the history itself actually reflects that she's not a flight risk, specifically speaking, the 2019 to 2021. I want to bring that as a final note to the Court's attention. Because that if the Government believed that she was a flight risk, they could have very easily detained her even at the -- in beginning of this year, but they didn't. And they didn't throughout this whole process and she's stayed, and continued to stay; and was polite and cooperative.

I would submit to the Court that this is the very type of case that warrants pre-trial release. Thank you, Your Honor.

THE COURT: Thank you.

(Pause)

THE COURT: Ms. Guirguis, what was the -- you referenced a recent Fourth Circuit case, what was that?

MS. GUIRGUIS: United States (indiscernible) and I can tell you the citation, 922 F2d 880 -- oh, no, no, no, that's another case.

Your Honor, I can -- I'm pretty sure I might have a copy of it, if you can give me a minute.

THE COURT: I can certainly look it up, if there's a cite.

MS. GUIRGUIS: Yes, it's a -- if I may approach? I can give you a copy.

THE COURT: You may.

MS. GUIRGUIS: And I can give you the Salerno cite, Your Honor, if you would like?

THE COURT: Yes, please.

MS. GUIRGUIS: United States v. Salerno, and that is 481 U.S. 739, 1987.

MR. BOYKIN: How do you spell Salerno?

MS. GUIRGUIS: S-A-L-E-R-N-O.

THE COURT: Thank you, Ms. Guirguis. And I am familiar with the Salerno case.

MS. GUIRGUIS: Thank you, Your Honor.

(Pause)

(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT:  Here's what I'm going to do, we're going to take a -- I'm taking recess until 2:30, at which time I will -- while I consider the arguments made by counsel, the evidence presented here today, at which time I will give my ruling with regard to mister -- excuse me, Ms. Santillan-Rodriguez.  And then we will take up immediately thereafter Mr. Burles (ph.) detention hearing.

Court will be in recess until 2:30.

THE BAILIFF:  All rise.  Court stand for recess.

(Recess from 1:30 p.m., until 3:24 p.m.)

THE BAILIFF:  This Court's back in session.  Be seated.  Come to order.

THE COURT:  This will be the ruling of the Court.

I've considered the credible evidence and credible information received here today, including the following:  the pre-trial services report; testimony of law enforcement Special Agent Manning with the United States Diplomatic Security Service; testimony of the proposed third-party custodian Mr. Santillan, the nephew of the defendant; proffers by the Government; proffers by counsel for the defendant, specifically with regard to the defendant's son; arguments by both counsel; and the three Government exhibits on the record, Government Exhibit 1, a birth certificate from Mexico, per the testimony of the agent; Government Exhibit 2, a Mexican passport; and Government Exhibit 3, a California birth

(973) 406-2250 | operations@escribers.net | www.escribers.net

certificate, a delayed registration birth certificate from 2019.

This is a case in which there is not a rebuttal of presumption that applies and I'll, therefore, turn to the Bail Reform Act factors, which include the nature and circumstances of the offense with which the defendant is charged, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the risk posed to the community by the defendant's release. I will go through each of these in a moment.

After considering those factors, it is appropriate to grant the Government's motion for detention because it has shown by a preponderance of the evidence that there are no conditions that I could impose that would reasonably ensure the defendant's appearance as required.

In reaching this decision, specifically under 18 USC 3142(g), considering the nature and circumstances of the offense charge, this is a -- these are offenses that are very serious in nature. It's reflected by the substantial available penalties. As an example of this, Count I alone, authorizes a ten-year maximum sentence even for nonaggravated violations.

The circumstances -- and I will note, this is a fourteen count indictment alleging offense conduct occurring

between April of 2019 through March of 2021. The circumstances of the alleged offense are indicative of a serious risk of nonappearance. The defendant is charged with crimes involving use of false documents, efforts to obtain documents as specified in Count I: a United States passport claiming to be having been born in California. They are crimes that involve the use of false documents and seeking to obtain documents that would legitimize any citizenship here.

With regard to the weight of the evidence, I do find the evidence is strong, but it is certainly not without issue that may be raised by the defendant. However, those are certainly matters for trial and not for a detention hearing, but I have considered the weight. Specifically, the documents on the record: Government's Exhibits 1, 2, and 3. Although there are -- there is a California delayed registration birth certificate indicating birth here in this country, as the testimony was, the behavior of the defendant is not indicative of someone who believes themselves to be a United States citizen. By the Defense own admission, she traveled to Mexico by plane, with a Mexican passport, and returned by covert means; that being the Court's term. That was not used, I believe, it was smuggled. Also, this was a statement made by the defendant herself to law enforcement.

Evidence was presented that she has used various iterations of her name. As included in the testimony, as

(973) 406-2250 | operations@escribers.net | www.escribers.net

pointed out by her daughter during the interview that Agent Manning conducted, that the Mexican birth certificate had a different name to which the, and I am paraphrasing the testimony, but it was that the defendant's daughter pointed out that this was not her name. And the defendant did say, that her full name was as written and as charged in the indictment.

With regard to the history and characteristics of the defendant, although I certainly recognize that she has substantial ties to the district, there are also family ties to Mexico. It appears that the persons that she would have contact here, there's a lack of ties to people in this area with lawful status, evidenced by what was put on the record of her husband's arrest on immigration related charges as well.

Evidence was also presented by the Government that her son, as charged, is seeking immigration status here and is not legally in this country. Again, the defendant also admitted to travelling to Mexico and the United States, per the testimony of the agent. There was testimony given, as well, with regard to the Mexican passport, that Ms. Santillan told the agent that she was not in possession of the passport. And that certainly may very well have been true, that it was in Mexico. However, the testimony was that when the search warrant was performed in March, a passport was found with a date that was after the time stated by the defendant that she

(973) 406-2250 | operations@escribers.net | www.escribers.net

had possessed the other passport.

The nature of the charges here, as I've said, involve an effort to obtain false documentation as a U.S. citizen, effort to assist others, her son, in doing so, utilizing her purported status as a United States citizen. She does face the prospect of deportation at the conclusion of these proceedings and any custodial sentence that there may be.

I do certainly make note of Ms. Guirguis' argument on the timeframe of the investigation. It does span a lengthy period of time, from 2019 through June of 2021. And the arguments made by the Defense are certainly well taken that there could have been flight in any of that period of time and it did not happen.

In making note of that, it counters it by a preponderance of the evidence that there are not conditions that I could set, by the fact that the offense conduct alleged in the indictment continues throughout that period after mister -- excuse me, after Ms. Santillan was interviewed by agents.

There are allegations that she then registered to vote, on several occasions made false statements in so doing. Being in February, September of 2020, and then alleging that she did indeed vote in November of 2020. Then possessed the passport, or excuse me, the California birth certificate alleged to have been precured by means of false claim or

statement, in March of 2021, when the search warrant was executed at the house.

Ms. Santillan-Rodriguez, it appears by the testimony of the agent, that she has lived here for many years, up to twenty-five years or more, and has successfully not -- has successfully avoided, prosecution or law enforcement with regard to immigration status.

She does have -- she does not have a criminal history, certainly, but given the charges, this is a different -- this is a different case in that this involves the immigration rules and laws of the state, of the country, which have been successfully avoided it appears, based upon the testimony, for a long period of time; the entire time she has lived here. Indicative by the fact that, again, her admitted having been smuggled back into the country as was the testimony, not the -- not indicative of someone who is a United States citizen.

The fact that she did not flee after having been interviewed by agents, she did not know, certainly, what the status of the investigation was. She had successfully been here in this country for many many years and would have no reason to believe it could not have continued, she could not have continued to stay here without consequence.

The circumstances are certainly different, her having been charged with federal felonies for which she may serve a

substantial amount of time in prison. Certainly, substantial being relative in that she has not ever been -- does not have a criminal history and has not served time in prison before. And as I've stated, these are very serious charges and the maximum penalties are indicative of that.

With regard to the proposed release plan, third-party custodian and the availability of home confinement with electronic monitoring, I find by a preponderance of the evidence that these conditions would not reasonably address the risk of nonappearance and potential flight. Because the defendant, she could certainly leave her residence before probation or law enforcement could reasonably respond to a report of her absence. Particularly, given that the proposed third-party custodian Mr. Santillan, works a full-time job.

Mr. Santillan, I commend you for being willing to serve as a third-party custodian. That is a very difficult position to be in. My decision is not based upon your -- any disbelief of the Court that you would not report any potential violation by your aunt. However, by a preponderance of the evidence, I do believe that the risks of nonappearance exceed any of the conditions that could be set, those being the two.

The proposed house, would be the same house where these offenses were committed, with persons present there who were allegedly there when these crimes were committed, and from whom she was either able to hide these actions or they

had knowledge of it and did not report it. So I do not find that there is a suitable release plan.

I have also taken into account, and the certainly legitimate concerns of the defendant's son, who is disabled and requiring of twenty-four-hour care and medicine. I do note that she has been in custody for the past several weeks. There does appear to be family who can take care of him. I do recognize the point made by -- raised by you, Ms. Guirguis, that she and her -- the defendant and her husband, who is also in custody at this time, are the legal guardians and the family members that are currently caring for her son are not. However, I do believe that is something that could be addressed.

It does appear, again, also based upon the testimony of the proposed third-party custodian Mr. Santillan, although he does not know who is taking care of her -- excuse me, him, it does appear that he is being well cared for.

It is for these reasons, as well as what I stated at the beginning of this ruling, the information that I've considered here today, that I find that by a preponderance of the evidence, there are no conditions that I could impose that would reasonably ensure the defendant's appearance as required.

Is there anything further for the defendant, Ms. Guirguis?

(973) 406-2250 | operations@escribers.net | www.escribers.net

MS. GUIRGUIS: Yes, we would just like to place on the record that we will be appealing this decision.

THE COURT: Sure. Anything from the Government?

MR. BOYKIN: Nothing further from the Government, Your Honor.

THE COURT: Ms. Santillan, this will conclude your detention hearing. As you heard, your counsel has just given notice of appeal. This case, this will -- your case is before United States District Judge Myers and any appeal will be heard before him.

Anything further, Ms. Guirguis?

MS. GUIRGUIS: Not at this time.

MR. BOYKIN: Your Honor, you said this is before -- to Judge Myers?

THE COURT: That is what my docket indicates.

MR. BOYKIN: Thank you.

THE COURT: If that is incorrect, it is before the United States district judge who is assigned to this case.

MR. BOYKIN: No problem, Your Honor. I think the copy of my indictment I had still had it as unassigned, so.

THE COURT: Understood. It is before -- it is before him.

Ma'am, I remand you to the custody of the United States Marshall pending further proceedings in your case.

(Court is adjourned)

(973) 406-2250 | operations@escribers.net | www.escribers.net

CERTIFICATE OF TRANSCRIBER

I, Beth C. Keesee, court-approved transcriber, in and for the United States District Court for the Eastern District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of August, 2021.

/s/
_____
BETH C. KEESEE, CDLT-215

COURT-APPROVED TRANSCRIBER

(973) 406-2250 | operations@escribers.net | www.escribers.net